IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TONY WILSON,

        Petitioner,                    No. 2:08-cv-2885 MCE KJN P

    vs.

JAMES A. YATES,

        Respondents.           FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2006 conviction for possession and transportation of cocaine and cocaine base, and the unlawful use of a controlled substance.  Petitioner was sentenced to 29 years to life in state prison.  Petitioner claims the trial court's denial of petitioner's motion to suppress violated his Fourth Amendment rights, and admission of petitioner's allegedly involuntary confession violated the Fifth Amendment.  After careful review of the record, this court concludes that the petition should be denied.

////

////

1

II. <u>Procedural History</u>

On August 16, 2006, a jury found petitioner guilty of transportation of cocaine base, possession for sale of cocaine base, transportation of cocaine, possession of cocaine, and unlawful use of a controlled substance. (Clerk's Transcript ("CT") at 358-63.) The jury also found petitioner had suffered three prior serious felony convictions within the meaning of California's Three Strikes Law, and that petitioner had served four prior prison terms. (CT 179-81.) Petitioner was sentenced to two concurrent terms of twenty-five years to life, and to an additional four years based on petitioner's prior prison terms. (CT 447.) The trial court then stayed two terms of twenty-five years to life in state prison. (<u>Id.</u>)

Petitioner filed a timely appeal. On June 25, 2008, the California Court of Appeal for the Third Appellate District affirmed the judgment. <u>People v. Wilson</u>, 2008 WL 2516451 (Cal.App. 3 Dist., 2008). Petitioner filed a petition for review in the California Supreme Court, which was denied without comment on October 29, 2008. (Respondent's Lodged Document 5.)

Petitioner filed the instant petition on December 1, 2008. (Dkt. No. 1.)

III. <u>Facts</u>

The opinion of the California Court of Appeal contains a factual summary of petitioner's offenses pertinent to petitioner's claims:

> RELEVANT FACTUAL BACKGROUND FN 1
>
> FN1. As the sufficiency of the evidence supporting the convictions is not at issue here, but rather the sufficiency of the evidence underlying the denial of the motion to suppress and the propriety of the admission of [petitioner's] postarrest statements, portions of these facts are taken from the motion to suppress hearing and the Evidence Code section 402 hearing regarding the postarrest statements, rather than the trial transcript.
>
> At 10:40 p.m. on December 6, 2002, West Sacramento Police Officer Steve Godden was dispatched to the 800 block of Pine Street in West Sacramento because of an altercation between two women. When he arrived, Officer Reece had taken one woman into custody and asked Godden to ensure the other woman, who lived at

the Evergreen Circle apartments on Pine Street, made it home. The Evergreen Circle apartment complex has a north and a south gate on the west side of Pine, which serve as the entrances to the apartment complex. Godden and his partner, Officer George Hunter, followed behind the woman in their patrol car as she walked to her apartment. The officers and the woman they were seeing home proceeded from the area adjacent to the north gate toward the south gate. The distance Godden had to drive was approximately 154 feet. Traveling at a speed of three miles per hour, this would take over 20 seconds.

As they approached the south gate of the complex, Officer Godden saw [petitioner's] vehicle's headlights heading westbound on Evergreen Avenue, towards Pine. [Petitioner] was approximately 200 feet away and appeared to be traveling above the speed limit of 25 miles per hour.

Officer Godden and [petitioner] were both approaching the south gate of the Evergreen Circle complex. Godden was proceeding in a stop-and-go manner, traveling between two to five miles per hour. He was tracking [petitioner] off and on intermittently as [petitioner] traveled down Evergreen Avenue, while simultaneously watching the woman he was escorting home and watching where he was driving. As Godden and [petitioner] both approached the intersection of Pine Street and Evergreen Avenue, Godden was turning right into the south gate of the apartment complex, when [petitioner] drove over the double yellow line and crossed through the gate.FN2 Because of [petitioner's] driving, Godden had to abruptly apply his brakes to avoid a collision with [petitioner's] car.

> FN2. Because of the configuration of the street, a car driving westbound on Evergreen would have to cross the double yellow line to enter the Evergreen Circle complex at the south gate.

Officer Godden initiated a vehicle stop for [petitioner's] failure to yield the right of way at the intersection. He advised [petitioner] why he was being stopped and asked for [petitioner's] driver's license. [Petitioner] appeared very nervous. He was sweating profusely, although it was a cold December night. He had rapid speech and body movements. His pupils were dilated and showed slow reactions to light. [Petitioner] was overly nervous and nonresponsive to questions. He also made movements toward the center portion of his seat which made Godden uncomfortable and concerned for his safety. Based on his observations, Godden concluded [petitioner] was under the influence of drugs. He asked [petitioner] whether he had imbibed in the use of any controlled substance and [petitioner] admitted he had used marijuana about an hour previously. This admission was inconsistent with Godden's observations. Godden also asked [petitioner] if he had any weapons

in the vehicle and [petitioner] admitted he had a knife in the car.

Based on [petitioner's] admissions of having a weapon and Officer Godden's observations of his demeanor, [petitioner] was ordered out of his car and Godden conducted a pat-down search of [petitioner] for weapons. He felt an object in [petitioner's] sock, which he suspected was rock cocaine and asked [petitioner] about it. [Petitioner] admitted it was rock cocaine. [Petitioner] was then placed under arrest and placed in Godden's patrol car. As he was being placed in the patrol car, [petitioner] told Godden he would save him some work and to look under the front seat, "[y]ou'll find it anyway." Officer Hunter looked under the front seat and found a large amount of what appeared to be rock cocaine. Even without [petitioner's] admission as to the cocaine under the seat, Godden would have arrested [petitioner] for driving under the influence of a controlled substance, [petitioner's] car would have been towed and stored, and a search incident to arrest would have been conducted.

Testing of the substance in the six plastic baggies retrieved by Officer Hunter from [petitioner's] car revealed cocaine base. All were usable amounts of drugs. [Petitioner] acknowledged that in total he had approximately three and one-half ounces of cocaine base.FN3 Approximately three ounces of cocaine base purchased in one large quantity would cost between $1,500 and $2,100. Broken down into the smaller one-ounce size typically sold on the street, the street value of three and one-half ounces of cocaine base is approximately $10,000.FN4

FN3. Five of the six baggies were tested and measured. The cocaine from [petitioner's] sock was not tested or measured. The net weights from the baggies tested were 25.88 grams, 25.17 grams, 27.04 grams, 5.86 grams and 0.68 grams.

FN4. A $10 "rock" is approximately one ounce and represents a typical dosage unit of cocaine base.

After [petitioner] was placed under arrest, Officer Godden obtained a urine sample from him. [Petitioner] tested positive for amphetamine, methamphetamine, cocaine and marijuana.

Because of the large amount of narcotics involved, Officer Godden called Officer Nathan Steele, advised him of [petitioner's] arrest and asked him to come and interview [petitioner]. Officer Steele is a member of the Yolo County Narcotics Enforcement Team (YONET). Godden referred [petitioner] to Officer Steele to obtain a statement from [petitioner] and because of [petitioner's] potential as an informant. Steele MirandizedFN5 [petitioner]; [petitioner] indicated he understood his rights and provided Steele with a statement.

4

FN5. Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694] (Miranda).

Officer Steele did not make [petitioner] any promises prior to or during the interview. After [petitioner] spoke about the circumstances of his arrest, Steele spoke with [petitioner] about the possibility of working as an informant.

Officer Steele explained the process of becoming an informant to [petitioner]. He noted that [petitioner] was facing significant charges and if he had information which could assist law enforcement, they would be interested in discussing it with him. He also advised he could not make any promises, but that there was a detailed process for informants to follow and extensive criteria they have to fit. If [petitioner] met the criteria, then there is a lengthy process by which a contract is entered into.

Officer Steele told [petitioner] potential informants were asked to provide some initial information to let law enforcement know the informant's information is legitimate, as a sort of show of good faith. In that effort, [petitioner] gave the officer some names and permission to obtain a phone book from his home. After providing that initial information, "when [petitioner] understood the rules and regulations that he was going to have to follow and the process that he was going to have to follow" he changed his mind about being an informant. No agreement was ever reached, no contract entered into and no information [petitioner] provided led to any arrests.

After he was Mirandized, [petitioner] relinquished to Officer Steele $492 that had been in the waistband of his pants. [Petitioner] related to Steele that he had been driving his car, had been stopped by Officer Godden, a small amount of cocaine was found in his sock, and when he was arrested, he told the officer about the additional cocaine in the car. Upon further questioning, [petitioner] stated he had purchased the drugs in Sacramento for $1,800, that he had wanted to purchase six ounces but was not able to, and that he was at the Evergreen Circle apartments to drop off the rock cocaine to be sold. [Petitioner] stated he had been selling cocaine for a couple of months, approximately three quarters of a pound a week. [Petitioner] also stated he had previously dealt in large amounts of marijuana. Officer Steele interviewed [petitioner] for approximately an hour and a half to two hours. [Petitioner] reported his own activities that night within the first 10 to 20 minutes of that interview. Towards the end of the interview it appeared [petitioner] was trying to negotiate benefits he would receive for providing the information, but they were not things Officer Steele could provide.

[Petitioner] testified that Officer Godden, knowing [petitioner] was a three strikes candidate with a violent history, had indicated he knew someone who could help [petitioner]. Based on this

5

representation, [petitioner] agreed to speak with Officer Steele. [Petitioner] and Steele discussed the circumstances of his arrest. Steele asked [petitioner] if he knew anything about "helping [Steele] arrest people for drugs. He said because if I work with him I can get a lighter sentence maybe. He didn't make a specific promise but he did state that he had connections with the DA. If I helped him out they would be able to help me out." There were never any specific details of the "help."

[Petitioner] claimed he told Officer Steele about his activities that evening to "let him know that I did know people and wasn't just ... running my mouth." He wanted to assure Steele of this because he was looking for the promise of a lighter sentence. [Petitioner] also told Steele a "couple [of] street names." Steele told [petitioner] he would need more information and [petitioner] offered him the phone book. [Petitioner] claimed, as an experienced arrestee and interrogatee of police based on his extensive criminal history, he would not have made the statements he did without the promise he would be "helped out on [his] criminal case" by Steele. [Petitioner] said he stopped cooperating with Steele because being an informant went against his beliefs.

## PROCEDURAL HISTORY

[Petitioner] was charged by information with two counts of transportation of cocaine base (Health & Saf. Code, § 11352, subd. (a)-counts 1 and 8), two counts of possession for sale of cocaine base (id., § 11351.5-counts 2 and 9), transportation of cocaine (id., § 11352, subd. (a)-count 3), possession of cocaine (id., § 11350, subd. (a)-count 4), two misdemeanor counts of driving under the influence of drugs (Veh. Code, § 23152, subd. (a)-counts 5 and 10), two counts of misdemeanor unlawful use of a controlled substance (Health & Saf. Code, § 11550, subd. (a)-counts 6 and 11), misdemeanor driving without a valid driver's license (Veh. Code, § 12500, subd. (a)-count 7), and one count of bringing a controlled substance into jail (Pen. Code, § 4573-count 12). It was further alleged [petitioner] had four prior serious felony convictions (Pen. Code, §§ 667, subd. (e)(2), 1192.7, subd. (c) and had served four prior prison terms (id., § 667.5, subd. (b)).

The trial court denied [petitioner's] motion to suppress evidence for counts 1 through 7, but granted a motion to suppress the evidence underlying counts 8 through 12.FN6 The court dismissed counts 8 through 12. The People later moved to dismiss count 7 for lack of sufficient evidence and the motion was granted. Also on the People's motion, one of the prior serious felony conviction enhancements was stricken.

> FN6. Counts 8 through 12 arose from a separate incident after the events underlying counts 1 through 7.

6

1
2
3
4
5

> The jury found [petitioner] guilty of two counts of transportation of a controlled substance (counts 1 and 3), one count of possession for sale of cocaine base (count 2), one count of possession of cocaine (count 4), and one misdemeanor count of being under the influence of narcotics (count 6). The jury also found true that [petitioner] had suffered three prior serious felony convictions and served four prior prison terms. [Petitioner] was found not guilty of driving under the influence of drugs (count 5, Veh. Code, § 23152, subd. (a)). (RT 466-469, CT 358-370)

6
7
8
9

> [Petitioner] was sentenced to 25 years to life on counts 1 and 3, to be run concurrently. He was also sentenced to 25 years to life for counts 2 and 4, which sentences were stayed under Penal Code section 654. On count 6, he received an additional six months in county jail, concurrent with count 1. He was also sentenced to consecutive one-year terms for each of the four prison term priors, for an aggregate term of 29 years to life.

10 People v. Wilson, 2008 WL 2516541 at *1-4.

11 IV. Standards for a Writ of Habeas Corpus

12 An application for a writ of habeas corpus by a person in custody under a

13 judgment of a state court can be granted only for violations of the Constitution or laws of the

14 United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the

15 interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

16 Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

17 Federal habeas corpus relief is not available for any claim decided on the merits in

18 state court proceedings unless the state court's adjudication of the claim:

19
20

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

21
22

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

23 28 U.S.C. § 2254(d).

24 Under section 2254(d)(1), a state court decision is "contrary to" clearly

25 established United States Supreme Court precedents if it applies a rule that contradicts the

26 governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

7

1  indistinguishable from a decision of the Supreme Court and nevertheless arrives at different

2  result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06

3  (2000)).

4          Under the "unreasonable application" clause of section 2254(d)(1), a federal

5  habeas court may grant the writ if the state court identifies the correct governing legal principle

6  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

7  prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ

8  simply because that court concludes in its independent judgment that the relevant state-court

9  decision applied clearly established federal law erroneously or incorrectly. Rather, that

10  application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

11  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

12  question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations

13  omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief

14  so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

15  Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

16          The court looks to the last reasoned state court decision as the basis for the state

17  court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). If there is no reasoned

18  decision, "and the state court has denied relief, it may be presumed that the state court

19  adjudicated the claim on the merits in the absence of any indication or state-law procedural

20  principles to the contrary." Harrington, 131 S. Ct. at 784-85. That presumption may be

21  overcome by a showing that "there is reason to think some other explanation for the state court's

22  decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

23          Where the state court reaches a decision on the merits but provides no reasoning

24  to support its conclusion, the federal court conducts an independent review of the record.

25  "Independent review of the record is not de novo review of the constitutional issue, but rather,

26  the only method by which we can determine whether a silent state court decision is objectively

1     unreasonable." <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

2     decision is available, the habeas petitioner has the burden of "showing there was no reasonable

3     basis for the state court to deny relief." <u>Harrington</u>, 131 S. Ct. at 784.  "[A] habeas court must

4     determine what arguments or theories supported or, . . . could have supported, the state court's

5     decision; and then it must ask whether it is possible fairminded jurists could disagree that those

6     arguments or theories are inconsistent with the holding in a prior decision of this Court." <u>Id.</u> at

7     786.

8     V. <u>Petitioner's Claims</u>

9             A. <u>Trial Court's Denial of Motion to Suppress</u>

10             Petitioner claims there was not substantial evidence to support the trial court's

11    denial of petitioner's December 6, 2002 motion to suppress.  Petitioner claims it was improbable

12    that Officer Godden was required to slam on his brakes to avoid a collision with petitioner, and

13    therefore did not warrant a failure to yield traffic violation, and the trial court should have

14    granted petitioner's motion to suppress.

15             The last reasoned rejection of this claim is the decision of the California Court of

16    Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

17    this claim as follows:

18                          DISCUSSION

19       I. The Motion to Suppress Was Properly Denied

20        [Petitioner] complains there was not substantial evidence to
        support the denial of his motion to suppress. Specifically, he
21       contends Officer Godden's testimony regarding [petitioner's]
        failure to yield was inherently improbable. He supports this claim
22       by arguing that since Officer Godden was tracking [petitioner's]
        car "constantly" for at least 22 seconds, he could not have had to
23       slam on his brakes to avoid a collision with [petitioner]. We reject
        this claim.
24

25        Our review of a trial court's ruling on a motion to suppress is
        governed by well-settled principles. We review for substantial
        evidence with respect to historical factual findings, express or
26       implied, but give independent review to the applicable rule of law

and application of the facts to resolve whether there has been a constitutional violation.  (People v. Glaser (1995) 11 Cal.4th 354, 362; People v. Williams (1988) 45 Cal.3d 1268, 1301.)  On appeal, all presumptions favor the trial court's exercise of its "'power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences.'" (People v. Leyba (1981) 29 Cal.3d 591, 596.)

It is equally true that "'an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable.'" (People v. Thornton (1974) 11 Cal.3d 738, 754, disapproved on other grounds in People v. Martinez (1999) 20 Cal.4th 225, 234, and People v. Flannel (1979) 25 Cal.3d 668, 684, fn.12.)  In order to reject factual assertions as "inherently improbable," however, there must be " 'either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.  [Citations.]  Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'" (Thornton, at p. 754; accord, People v. Barnes (1986) 42 Cal.3d 284, 306.)

Defense counsel expressly raised the issue of "inherent improbability" to the court, arguing "Officer Godden wants the Court to believe that he had to slam on his brakes to avoid a collision with [petitioner].  Yet, the facts of the matter are he's going two to three miles an hour. . . .  Assuming he took his foot off the brake and the car even got to five miles an hour at any point in time between the 150-foot area that he had to travel, . . . he still is not going fast enough to have to slam on his brakes to avoid a collision.  [¶]  He wants you to listen to it both ways.  He wants you to say, you know, I didn't really see him coming because the trees and the bushes blocked my view but, you know, I saw him going at a high rate [of] speed and at least a hundred to two hundred feet away.  But after that was traveled and I had seen him and knew he was coming my way, I still had to slam on my brakes to avoid a collision.  And that's why I stopped him....  There is no way in the world an experienced officer like Officer Godden has to slam on his brakes to avoid a collision when he's going two to three miles an hour."

The court believed Officer Godden's testimony that [petitioner] failed to yield the right of way.  We find nothing inherently improbable in Godden's testimony.  While he was driving down Pine Street, he intermittently kept an eye on [petitioner] traveling down Evergreen.FN7  He also kept an eye on the woman he was escorting home and kept an eye on where he was driving. Furthermore, we do not assume by virtue of the simple fact Godden was aware of and watching [petitioner's] progress that he necessarily should have anticipated [petitioner] would fail to yield

1    at the intersection.  It is an equally likely inference that Godden
     presumed [petitioner] would properly yield the right of way,
2    particularly to a marked police car.  Godden's testimony was not a
     physical impossibility nor is falsity apparent on its face.
3    Accordingly, there was substantial evidence to support the trial
     court's denial of [petitioner's] motion to suppress.
4
          FN7. [Petitioner] quotes only part of Officer
5         Godden's testimony in which Officer Godden stated
          he "kept constant visual on [petitioner]."  Quoting
6         only that portion of Officer Godden's testimony,
          however, is an inaccurate representation of the
7         testimony.  As Officer Godden continued his
          testimony, it was clear he was only able to watch
8         [petitioner's] progress down Evergreen
          intermittently.  Even defense counsel at trial
9         characterized it as such.

10   People v. Wilson, 2008 WL 2516451 at *4-5.

11          This claim is not cognizable in a federal habeas corpus proceeding.  The United

12   States Supreme Court has held that "where the State has provided an opportunity for full and fair

13   litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas

14   corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was

15   introduced at his trial."  Stone v. Powell, 428 U.S. 465, 494 (1976).  Thus, a Fourth Amendment

16   claim can only be litigated on federal habeas where petitioner demonstrates that the state did not

17   provide an opportunity for full and fair litigation of the claim; it is immaterial whether the

18   petitioner actually litigated the Fourth Amendment claim.  Ortiz-Sandoval v. Gomez, 81 F.3d

19   891, 899 (9th Cir. 1996); Gordan v. Duran, 895 F.2d 610, 613 (9th Cir. 1990).

20          The issue before this court is whether petitioner had a full and fair opportunity in

21   the state courts to litigate his Fourth Amendment claim, not whether the state courts correctly

22   disposed of the Fourth Amendment issues tendered to them or even whether the claim was

23   correctly understood.  See Siripongs v. Calderon, 35 F.3d 1308, 1321 (9th Cir. 1994).  The Ninth

24   Circuit has concluded that California provides criminal defendants with a full and fair

25   opportunity to litigate their Fourth Amendment claims through a motion to suppress remedy

26   provided by California Penal Code § 1538.5, which establishes a specific mechanism for

1  defendants to seek the suppression of evidence on the ground that it was obtained through

2  unconstitutional means.  See Gordon, 895 F.2d at 613; see also Locks v. Summer, 703 F.2d 403,

3  408 (9th Cir. 1983).

4          Here, the trial court held a hearing on petitioner's motion to suppress on June 26,

5  2006, and July 24, 2006, pursuant to California Penal Code § 1538.5.  (Reporter's Transcript

6  ("RT") at 17-152).  The trial court conducted a lengthy evidentiary hearing before ruling on the

7  validity of the initial traffic stop and the subsequent search and seizure.  Petitioner called his

8  investigator, who provided testimony as to measurements and photographs taken at the traffic

9  scene.  (RT 114-19.)  Petitioner's trial counsel cross-examined the arresting officer and zealously

10  argued the suppression motion to the trial court.  (RT 41-72; 135-48.)  Therefore, petitioner used

11  the opportunities afforded him to have the trial court's ruling reviewed within the California

12  judicial system through his arguments on appeal setting forth his claim.  The California Court of

13  Appeal addressed petitioner's claim in a reasoned decision and denied the claim on the merits.

14  The California Supreme Court denied relief on the merits of the claim on the same grounds

15  articulated by the state appellate court.

16          The fact that petitioner was able to raise his claim at multiple levels of the

17  California court system and to have the claim considered on the merits compels the conclusion

18  that the Stone doctrine applies in this case.  See Locks, 703 F.2d at 408 (when petitioner litigated

19  the search and seizure issue in the trial court and the appellate court, and also raised the issue

20  before the California and United States Supreme Courts, petitioner received a "full and fair

21  consideration of his Fourth Amendment claim"); see also Terronova v. Kincheloe, 912 F.2d

22  1176, 1178-79 (9th Cir. 1990) (the "extent to which [Fourth Amendment] claims were briefed

23  before and considered by the state trial and appellate courts" is a consideration in determining

24  whether petitioner had the opportunity for a full and fair litigation of those claims).

25          Thus, petitioner had a full and fair opportunity to litigate his Fourth Amendment

26  claim in state court.  Accordingly, petitioner's Fourth Amendment claim herein is barred.

1    In his reply, petitioner states he disagrees that he was given a full and fair hearing

2    based on trial counsel's evidence that the officer did not have to slam on his brakes, again

3    arguing the merits of petitioner's underlying claim.  (Dkt. No. 21 at 2.)

4    Petitioner's disagreement with the state courts' factual and legal conclusions

5    regarding his Fourth Amendment claim does not exempt him from the Stone doctrine, because a

6    finding that petitioner had a "full and fair opportunity" to litigate his claim does not depend on

7    whether his claim was correctly decided by the state courts.  Ortiz-Sandoval, 81 F.3d at 899; see

8    also Moormann v. Schriro, 426 F.3d 1044, 1053 (9th Cir. 2005) (Stone doctrine barred Fourth

9    Amendment claim, notwithstanding contention that the hearing received was not full and fair

10   because the state court's factual findings were "not supported by the evidence," when Moormann

11   raised the Fourth Amendment issue in a pretrial motion; a hearing was held, at which Moormann

12   was able to present evidence and examine witnesses; the trial court made a factual finding; and

13   the trial court's decision was reviewed on appeal by the state high court); Locks, 703 F.2d at 408

14   (rejecting argument that petitioner did not receive a full and fair hearing because the state

15   appellate court considered evidence not offered at the suppression hearing); Mack v. Cupp, 564

16   F.2d 898, 902 (9th Cir. 1977) (rejecting argument that petitioner did not receive a full and fair

17   hearing because the state appellate court incorrectly summarized evidence).  Thus, pursuant to

18   the Stone doctrine, the instant petition is not cognizable.  See Siripongs, 35 F.3d at 1321

19   (petitioner's argument challenging the validity of his search, as in this case, "goes not to the

20   fullness and fairness of the opportunity to litigate the claim, but to the correctness of the state

21   court resolution, an issue which Stone v. Powell makes irrelevant").

22   Therefore, petitioner's first claim for relief should be denied as barred by the

23   Stone doctrine.

24   ////

25   ////

26   ////

13

1               B.  <u>Alleged Involuntary Confession</u>

2               In his second claim, petitioner claims his confession to Officer Steele was

3  involuntary and inadmissible.

4               The last reasoned rejection of this claim is the decision of the California Court of

5  Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

6  this claim as follows:

7           II.  [Petitioner's] Statements Were Voluntary and Properly Admitted

8           [Petitioner] also contends his statements to Officer Steele were
involuntary.  Specifically, [petitioner] argues he "understood that
9          he was required to confess and supply Steele with specific
information regarding his drug dealing contacts and, in return, he
10         would receive a lightened sentence."  This claim is not supported
by the record.

11

12           "A finding of coercive police activity is a prerequisite to a
finding that a confession was involuntary under the federal and
13         state Constitutions.  [Citations.]  A confession may be found
involuntary if extracted by threats or violence, obtained by direct or
14         implied promises, or secured by the exertion of improper
influence."  (<u>People v. Maury</u> (2003) 30 Cal.4th 342, 404.) The
15         question is whether the [petitioner's] "'will was overborne at the
time he confessed.'"  (<u>Ibid.</u>, quoting <u>Lynumn v. Illinois</u> (1963) 372
16         U.S. 528, 534 [9 L.Ed.2d 922, 926].)

17           To determine whether [petitioner's] will was overborne, we
consider the totality of the circumstances, including both the
18         "'characteristics of the accused and the details of the
interrogation.'"  (<u>In re Shawn D.</u> (1993) 20 Cal.App.4th 200,
19         208-209, italics omitted; <u>see also</u> <u>People v. Holloway</u> (2004) 33
Cal.4th 96, 114.)  Thus, such factors as the [petitioner's] age,
20         sophistication, education, physical condition, mental health, and
prior experience with the justice system as well as the length of the
21         interrogation, its location, and the interrogation techniques
employed by the interrogators must all be considered.  (<u>People v.</u>
22         <u>Williams</u> (1997) 16 Cal.4th 635, 660 (<u>Williams</u>); <u>Shawn D.</u>, <u>supra</u>,
20 Cal.App.4th at p. 209.)

23           The appellate court reviews, de novo, the trial court's
determination on the issue of voluntariness, while reviewing under
24         the deferential substantial evidence standard, the trial court's
historical findings of fact surrounding the confession.  (<u>Williams</u>,
25         <u>supra</u>, 16 Cal.4th at pp. 659-660.)

26           In the present case, the interview was conducted by a single

police officer, at a police station, following advisement and waiver of [petitioner's] <u>Miranda</u> rights.  Officer Steele questioned [petitioner] for between one and one-half to two hours.  [Petitioner] reported on his own activities relative to the charges in this case within the first 10 to 20 minutes of the interview.  At the time of his interview with Steele, [petitioner] was 44 years old.  [Petitioner] has a significant prior record, dating back to 1979.  He has been regularly in and out of prison since 1982.  By his own admission, he has been interrogated on numerous occasions, he was read his rights, understood those rights and understood he did not have to speak with Steele.

[Petitioner] wisely does not claim that these circumstances rendered his confession involuntary.  Instead, he focuses on his claim that Officer Steele promised he would assist him with the district attorney to obtain a lighter sentence.  He claims this was a promise of leniency which overcame his free will and induced admissions of his involvement in the crimes charged.

This brings us back to the "the cardinal rule of the Supreme Court regarding the admission of a [petitioner's] statement: '[W]here a person in authority makes an express or clearly implied promise of leniency or advantage for the accused *which is a motivating cause* of the decision to confess, the confession is involuntary and inadmissible as a matter of law.  [Citation.]' (<u>People v. Boyde</u> (1988) 46 Cal.3d 212, 238.)"  (<u>People v. Vasila</u> (1995) 38 Cal.App.4th 865, 873, italics added.)  This is a two-part inquiry.  "[W]as a promise of leniency either expressly made or implied, and if so, did that promise motivate the subject to speak?" (<u>Ibid.</u>)

The evidence in this case is uncontradicted that there was no promise of leniency for [petitioner's] information regarding his criminal activities of that night.  Rather, after [petitioner] spoke about his activities, there was a discussion about Officer Steele "help[ing] with the D.A." and the specter of a more lenient sentence *in exchange for [petitioner's] cooperation as an informant*.  As [petitioner] himself testified, there was no specific promise, "but he told me he would be able to help me out with the D.A. if I informed on people."  Thus, to the extent any implied promise of leniency was made, it was not made as an inducement for a statement or "confession" about these charges, but rather as an inducement for [petitioner] to become an informant.

The quid pro quo of an agreement, had one been reached, would have required Officer Steele to seek lenient treatment in return for [petitioner's] services as an informant for YONET; it would not have depended upon whether [petitioner] would make a statement to the police about the crimes charged here.  In fact, [petitioner] could have invoked his rights under <u>Miranda</u> and still indicated his willingness to work as an informant for YONET.  Thus, any

implied promise of Officer Steele to "help [with] the D.A." was not a motivating factor behind [petitioner's] "confession" regarding the charges in this case.

This view of the evidence is further supported by the specific circumstances of this case. This was not a crime that officers were seeking to solve. [Petitioner] was caught with three and one-half ounces of rock cocaine in his car. He had been driving his car immediately prior to being stopped. His urine sample indicated he had been under the influence of drugs. There was no substantive additional information of [petitioner's] "confession" which led to any additional charges or which resolved any uncertainties in the evidence. Officer Steele was not seeking additional information about [petitioner's] involvement in crimes. He was seeking information about others' involvement in crimes. Based on the record before us, we find no basis to conclude that [petitioner's] statements to Steele were involuntary.

People v. Wilson, 2008 WL 2516451 at *5-7.

The Court of Appeals for the Ninth Circuit has set forth standards for evaluating such a claim:

The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, commands that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. See also Malloy v. Hogan, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The Fifth Amendment protects against involuntary statements obtained by state coercion. See, e.g., Rogers v. Richmond, 365 U.S. 534, 540-41, 81 S. Ct. 735, 5 L.Ed.2d 760 (1961). Voluntariness is considered in light of the totality of the circumstances. See, e.g., Haynes v. Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). Specifically, we consider whether "the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir.1988). See also Hutto v. Ross, 429 U.S. 28, 30, 97 S. Ct. 202, 50 L.Ed.2d 194 (1976) (per curiam).

Beaty v. Stewart, 303 F.3d 975, 992 (9th Cir. 2002). "A statement is involuntary if it is 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" Leon Guerrero, 847 F.2d at 1366 (quoting Hutto v. Ross, 429 U.S. at 30 (internal quotation omitted)). In determining whether a defendant's statements were voluntary the court looks at the totality of the

1  circumstances.  See Doody v. Schriro, 548 F.3d 847, 858 (9th Cir. 2008) (quoting Dickerson v.

2  U.S., 530 U.S. 428, 434 (2000), and Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).

3  "The assessment of the totality of the circumstances may include consideration of the length and

4  location of the interrogation; evaluation of the maturity, education, physical and mental condition

5  of the defendant; and determination of whether the defendant was properly advised of his

6  Miranda rights."  Doody, at 859 (citing Withrow v. Williams, 507 U.S. 680, 693-94 (1993)).

7          However, even if there was a Miranda violation, the erroneous admission of

8  statements taken in violation of Miranda is subject to harmless error analysis under the Brecht

9  standard.  See Ghent v. Woodward, 279 F.3d 1121, 1126 (9th Cir. 2002) (On habeas review, the

10  "question is whether the erroneously admitted evidence had a 'substantial and injurious effect or

11  influence in determining the jury's verdict.'"  Id. at 1127 (quoting Brecht v. Abrahamson, 507

12  U.S. 619, 637 (1993)).)

13          Petitioner has failed to demonstrate that the state court's rejection of this claim

14  was based on an unreasonable determination of the facts.  The record supports the state court's

15  finding that petitioner was 44 years old and had a lengthy history of criminal activity, including

16  multiple arrests and incarcerations.  During the 402 hearing,[1] petitioner admitted he knew he was

17  facing a life sentence, he had been interrogated numerous times, knew exactly what to say or not

18  say, had been read his Miranda rights on more than one occasion, understood those rights, and

19  understood he didn't have to speak to Officer Steele at all.  (RT 337-38.)  The record supports the

20  state court's finding that there was no promise of leniency to induce petitioner to confess his

21  crimes, but to induce petitioner to become an informant.  (RT 329-30.)

22          In his traverse, petitioner relies on In re Cameron, 68 Cal.2d 487, 67 Cal. Rptr.

23  529 (1968), to argue that his statements were involuntary based on petitioner's intoxication at the

24

25          [1]  California Evidence Code § 402(b) provides that "in a criminal action, the court shall
    hear and determine the question of the admissibility of a confession or admission of the
    defendant out of the presence and hearing of the jury if any party so requests."  Cal. Evid. Code
26  § 402(b).

1   time of arrest.  In Cameron, the court held that a confession obtained from a suspect while he was

2   under the influence of Thorazine was involuntary.  Cameron was already intoxicated when he

3   was administered a dose of Thorazine six to twelve times the normal amount, which had the

4   effect of increasing and prolonging the effect of the Thorazine.

5          Here, petitioner claims he "admitted to being under the influence of

6   methamphetamine and marijuana at the time of his arrest."  (Dkt. No. 21 at 3.)  However,

7   petitioner presents no evidence as to the amount or timing of his alleged taking of either drug.

8   Petitioner has presented no facts demonstrating petitioner was so intoxicated by

9   methamphetamine and marijuana at the time of his arrest that his statements were rendered

10  involuntary.  Indeed, petitioner's testimony at the 402 hearing as to his understanding of what

11  consequences he faced at the time of his arrest demonstrates that petitioner was not so

12  intoxicated that he could not understand his fate or what statements he was making.  Moreover,

13  defense counsel did not even mention the issue of intoxication during the 402 hearing.  (RT 317-

14  47.)  Therefore, petitioner's reliance on Cameron is unavailing.

15         After review of the record and consideration of all of the circumstances

16  surrounding petitioner's interrogation, this court finds no evidence that the petitioner's

17  statements to Officer Steele were involuntary.

18         But even assuming petitioner's statements to Officer Steele were involuntary, the

19  admission of those statements was harmless error.  Petitioner's statements to Officer Steele could

20  not have substantially influenced the jury's verdict because of the large amount of drugs found in

21  petitioner's possession or control:  rock cocaine was found in petitioner's sock and a large

22  amount of rock cocaine was found under the seat of petitioner's car, all of which was estimated

23  to have a street value of $10,000.00.  This court finds that admission of petitioner's confession,

24  while certainly damaging, did not have a substantial effect on the verdict because other evidence

25  showed petitioner had control over the drugs.

26         Therefore, the state court's rejection of this claim was neither contrary to, nor an

1  unreasonable application of, relevant principles of federal law, nor was its decision based on an

2  unreasonable determination of the facts.  Thus, petitioner's second claim for relief should be

3  denied.

4  VI.  Conclusion

5          Accordingly, for all of the reasons set forth above, IT IS HEREBY

6  RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

7          These findings and recommendations are submitted to the United States District

8  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

9  one days after being served with these findings and recommendations, any party may file written

10  objections with the court and serve a copy on all parties.  Such a document should be captioned

11  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files

12  objections, he shall also address whether a certificate of appealability should issue and, if so, why

13  and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if

14  the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

15  § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after

16  service of the objections.  The parties are advised that failure to file objections within the

17  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

18  F.2d 1153 (9th Cir. 1991).

19  DATED:  May 2, 2011

21          KENDALL J. NEWMAN
22          UNITED STATES MAGISTRATE JUDGE

23  wils2885.157